IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CRIMINAL ACTION NO. 3:23-CR-00085-KDB-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| DIONTE MONTRAY EVANS, | ) |
| | ) |
| **Defendant.** | ) |

**THIS MATTER IS BEFORE THE COURT** on Defendant Dionte Montray Evans' Motion to Suppress (Doc. No. 19). Evans asks the Court to suppress all evidence regarding the marijuana, cocaine, digital scale, and firearm found in his possession and any statements he made to the police during an allegedly unlawful *Terry* stop. The Government contends that the police officer who seized Evans had the reasonable suspicion necessary to justify a *Terry* stop. The Court has carefully considered the parties' filings, oral arguments during the suppression hearing on January 10, 2024, and supplemental briefings. For the reasons explained below, the Court will **GRANT** Defendant's Motion to Suppress.

I.   FACTS AND PROCEDURAL HISTORY

In early 2023, Sergeant Alen Sejdic of the Charlotte-Mecklenburg Police Department was assigned to the second shift of the Eastway Division. *See* Doc. No. 24 ("Tr.") at 4. His primary duty was to answer 911 calls and, between those calls, to patrol high crime areas, conduct traffic stops, meet community members, "and just be in the area to deter crime and help out the community." *Id.* Around 7:00 pm on January 11, 2023, Sgt. Sejdic was parked in the parking lot of the Kilborne Mart "to show presence and be with the community." *Id.* at 5.

1

The area surrounding the Kilborne Mart is considered by the police to be a high crime area. *Id.* During the evening hours, there are lots of vendors in the area who sell food and clothing. *Id.* Sgt. Sejdic, while sitting in the parking lot, was approached by unknown individuals ("the tipsters") who informed him that "Hey, those two individuals are selling marijuana and cocaine and they're in the alleyway[1] of 2112 and 2110 Eastway Drive." *Id.* at 6. He then drove the short distance across the parking lot and approached two of the individuals in the alleyway, Kaiterrance Moore and Dionte Evans. *Id.* Sgt. Sejdic's body-worn camera footage ("BWC footage") shows another pair of individuals were also standing by the alley as he approached. Exhibit 1 ("BWC") (0:36). Upon his arrival, Moore fled. (Tr. 7). The rest of the events were captured by the BWC footage.

As he stepped out of his patrol vehicle, Sgt. Sejdic radioed dispatch to alert them to two "1088s," a police code for suspicious persons, and requested backup. BWC (0:32-0:36); (Tr. 24). He then walked to the other side of his vehicle and asked Evans, who at this point was standing by himself, "What are you guys doing out here?" BWC (0:38-40). Sgt. Sejdic then asked "Where'd Kaiterrance go? Why's he running?" as he closed the distance between himself and Evans. (0:42-0:44). Sgt. Sejdic relayed to police dispatch that he had a "subject in all black running from me. It's Kaiterrance Moore." (0:44-0:48). He next said to Evans, "Hang on a second. Why's he running?" (0:50-0:51). Evans said he did not know why Moore had fled. (0:52). Sgt. Sejdic then more authoritatively commanded Evans to "hang on a second" and raised his index finger to emphasize the point. (0:53).

---

[1] The parties refer to the area indicated by the tipsters and Sgt. Sejdic as an "alleyway" although it appears to be a wide portion of a parking lot or driveway between two buildings rather than the usual tight confines of an alleyway. Doc. 25 at 10-11.

2

Sgt. Sejdic then continued to speak with dispatch to coordinate the search for Moore, while Evans stood in front of him. (0:53-1:00). Sgt. Sejdic again asked, "Why's he running?" (1:01). Evans replied "I don't know. I just paid for my food. I'm not with him." (1:02-1:04). As Evans continued to explain that he was waiting for food he had ordered, Sgt. Sejdic asked "Why's he running so hard?" (1:24). "I don't know," Evans said. (1:26). As the conversation continued, Sgt. Sejdic questioned Evans' relationship with Moore, saying "every time I talk to y'all you guys say you are boys. You guys are cousins. That's my brother and all this crap. So now he's nobody to you?" (1:30-1:35). Evans said "no, sir," and as he proceeded to ask again about being able to go get his food, Sgt. Sejdic asked "Why's he running so hard?" (1:35-1:36). Evans protested again that he had nothing to do with Moore and was just waiting for his food. (1:38-1:42). Sgt. Sejdic said he only wanted to know why Moore was running from the police "like that." (1:43-1:44).

Sgt. Sejdic next asked Evans if he was "still staying over here at Magnolia?" (2:04-2:05). He then said, "There's a huge problem when someone like that is going to book it from me and run away from me." (2:07-2:10). For the next forty seconds, Evans tried to convince Sgt. Sejdic he was in the area only to wait for food he had ordered, and Sgt. Sejdic continued to speak with dispatch to coordinate the search for Moore. (2:11-2:51). Sgt. Sejdic then asked Evans "Why did you come back over here man? I know you're not allowed to be over there with that girl." (2:53-2:56). Evans said the unnamed woman had dropped her domestic violence accusations, (2:58-3:01), and then proceeded to explain that he was doing well and that the only pending action against him was a speeding ticket. (3:05-3:18). As the two continued standing there, Evans made no move to run and often faced Sgt. Sejdic directly. (3:19-4:12). Once backup arrived, Sgt. Sejdic informed Evans that he was going to pat him down. (4:13-4:15). During the pat down, after Sgt. Sejdic felt a baggie and asked Evans if it was marijuana, Evans fled. (4:20-4:30).

3

The two officers, Sgt. Sejdic and the newly arrived backup, pursued Evans on foot and Sgt. Sejdic reported to dispatch that Evans had drugs on his person. (4:30-5:01). The officers finally caught Evans, who laid face down on the ground, and cuffed him. (5:09-5:14). Sgt. Sejdic then directed an officer to find the firearm he had seen Evans drop during the pursuit. (5:20-5:23, 4:47-4:49). The weapon was quickly discovered on the driveway of the house Evans was running behind when he was caught. (6:07).

Ultimately, Evans was charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. 922(g)(1). *See* Doc. No. 1. In November 2023, Evans filed the Motion to Suppress now before the Court. *See* Doc. No. 19. In the motion, he asks the Court to suppress all evidence seized, including the cocaine, marijuana, and digital scale found in his pocket, the firearm he allegedly dropped, and any statements he made while he was seized. *Id.* The Court held a suppression hearing on January 10, 2024, and orally directed the parties to file supplemental briefs. (Tr. 58-59). The supplemental briefs have been submitted and this motion is now ripe for the Court's review.

## II. LEGAL STANDARD

The Fourth Amendment ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. However, rather than "proscrib[ing] all contact between the police and citizens," *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984), the Fourth Amendment "prevent[s] arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals," *id.* (quoting *United States v. Martinez-Fuente*, 428 U.S. 543, 554 (1976)). "[A] police officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop—known as a '*Terry* stop'—predicated on reasonable articulable suspicion that 'criminal activity may be

4

afoot.'" *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion, "a less demanding standard than probable cause," requires officers to have "at least a minimal level of objective justification for making the stop." *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). In short, it must be "something more than an 'inchoate and unparticularized suspicion or 'hunch.'"" *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000) (quoting *Terry*, 392 U.S. at 27). "The Government bears the burden of proving that reasonable suspicion justified a warrantless seizure." *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018) (citing *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013)).

To evaluate the lawfulness of a *Terry* stop, the Court must examine "the totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (internal quotation marks omitted). "The principal components of a determination of reasonable suspicion ... will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Mitchell*, 963 F.3d at 390 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

### III. DISCUSSION

The Court must first consider when Evans was seized because facts proffered to establish reasonable suspicion are "irrelevant" if they occurred after the time of seizure. *United States v. Black*, 707 F.3d 531, 539 n.5 (4th Cir. 2013).

#### A. Evans was Seized When the Officer Said "Hold on a Minute"

An individual is "seized" for purposes of the Fourth Amendment if, considering all of the circumstances, "a reasonable person would have believed that he was not free to leave." *Black*,

5

707 F.3d at 537 (quoting *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989)). The Court's review includes several specified factors:

> (i) the number of police officers present at the scene; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they "touched the defendant or made any attempt to physically block his departure or restrain his movement"; (v) "the use of language or tone of voice indicating that compliance with the officer's request might be compelled"; (vi) whether the officers informed the defendant that they suspected him of "illegal activity rather than treating the encounter as 'routine' in nature"; and (vii) "whether, if the officer requested from the defendant ... some form of official identification, the officer promptly returned it.

*Id.* at 537-38 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). The Court finds that Evans was seized when Sgt. Sejdic said "hang on a second" for the second time. BWC (0:51-0:53).[2]

After being informed that two individuals in the alleyway were allegedly dealing drugs, Sgt. Sejdic drove across the parking lot to confront Evans and Moore. (0:17-0:30). He called for backup as he stepped out of his patrol vehicle. (0:32-0:36). As Sgt. Sejdic walked around his car, in uniform and with a weapon in his belt, Moore fled. Sgt. Sejdic asked Evans "Where'd Kaiterrance go? Why's he running?" (0:42-0:44). Sgt. Sejdic then told Evans he could not leave to get the food he had ordered, asking him to "hang on a second." (0:51). As Evans turned away, Sgt. Sejdic more firmly said "hang on a second" as he raised his index finger, signaling Evans to pause. (0:53). Sgt. Sejdic's voice was raised and his tone was authoritative. *Id.* In fact, as Sgt. Sejdic later testified "this is not a normal contact … with citizens… But it's a normal contact from

---

[2] In his testimony, Sgt. Sejdic stated that he believed Evans was not free to leave at the time Moore fled. (Tr. 31). However, because seizure is judged by when a reasonable person believed he was not free to leave rather than the subjective intent of the officer conducting the stop, the Court finds this is not the time of seizure. *See Black*, 707 F.3d at 537.

6

what I'm dealing with right now." (Tr. 32). There was no casual discussion or request for information. Instead, Sgt. Sejdic's tone and language quickly indicated that Evans was not free to leave. Furthermore, given that Sgt. Sejdic had already called for backup, was relaying Moore's movements to dispatch and referred to Moore as a subject in front of Evans, Evans was effectively informed that Sgt. Sejdic suspected him of illegal activity. The Court therefore finds that Evans had a reasonable belief he was not free to leave by the time Sgt. Sejdic said "hang on a second" for the second time.

### B. The *Terry* Stop Was Not Supported by Reasonable Suspicion

Next, the Court finds that Sgt. Sejdic lacked reasonable suspicion at the time he seized Evans. At the time of seizure, Sgt. Sejdic's stated grounds for reasonable suspicion were the tipsters' information, Evans' criminal history, Moore's flight, and Evans' alleged "blading." As testified by Sgt. Sejdic: "Knowing this individual, Mr. Dionte Evans' history, my prior arrest with him, knowing that he was in possession of firearms before, and my senses of Kaiterrance Moore running away, and that the witnesses are telling me these two are dealing narcotics, I'm going to conduct a *Terry* frisk to see what's going on with Mr. Dionte Evans." (Tr. 29). The Court will address each justification in turn.

#### 1. The Unidentified Tipsters

Sgt. Sejdic testified that he spoke with unidentified individuals for "five, ten minutes" before approaching Evans and Moore. (Tr. 21). One of these alleged unidentified informants is seen on the BWC footage, although there is no audio. BWC (0:03). Sgt. Sejdic had no prior contact with these individuals, had never seen them before, lacked any information about their background, criminal records, addresses, or names, and was unable to locate these individuals after

7

the arrest to gather more details. (Tr. 22-24). The entirety of Sgt. Sejdic's testimony regarding the information provided to him by the tipsters is below:

> [C]itizens who are coming up to me, one individual, a third-party witness, tells me, 'Hey, **those two individuals** are selling marijuana and cocaine and they're right in the alleyway of 2112 and 2110 Eastway Drive.' (Tr. 6) (emphasis added).
>
> Q. And did you say that his statement to you was that there were **two individuals** selling marijuana and cocaine?
>
> A. Yes, ma'am.
>
> Q. And where did he indicate **those individuals** were?
>
> A. They were near the alleyway right before you get to 2112 Kilborne Drive …. I observed **two individuals** in the alleyway **as this gentleman described them to me**.³ (Tr. 6) (emphasis added).
>
> So my body-worn camera doesn't capture, but before I turned it on, I was speaking with different individuals in that parking lot who kept continuing to come to me saying, 'Hey, **those two individuals** are offering us marijuana and cocaine.' (Tr. 18-19) (emphasis added).
>
> [M]ultiple individuals coming up to me saying, 'Hey, this is what's going on. **These two guys** are selling marijuana and cocaine.' (Tr. 20) (emphasis added).
>
> So at that point I'm like, let me just go around and see what everybody is telling me, **who's here** and what's going on. (Tr. 22) (emphasis added).
>
> At this point, no, because my initial information from witnesses are two -- **these two individuals** are selling marijuana and cocaine. (Tr. 27) (emphasis added).
>
> It's just I had witnesses telling me **he** may be selling narcotics in the area. (Tr. 44) (emphasis added).⁴

---

³ It may well be that the tipsters described or indicated the "individuals" with more particularity, but if so, it was not elicited from Sgt. Sejdic during his testimony.

⁴ In his report detailing the encounter, Sgt. Sejdic said "I got out of my patrol vehicle and was flagged down by multiple third-party witnesses who stated that Mr. Evans and Moore were offering him [sic] marijuana and cocaine." (Tr. 18). The Court finds it likely that Sgt. Sejdic included Evans' and Moore's names in his report because they had ultimately been arrested, not because they were specifically named by the tipsters.

8

A *Terry* stop is lawful if it is supported by informant testimony with "substantial and verifiable details that established the necessary indicia of reliability." *United States v. Lawing*, 703 F.3d 229, 237 (4th Cir. 2012) (details provided included what car the defendant was driving, the route defendant would take, and the time at which the tipster said the defendant would arrive). The tipsters in this case provided no details specifically identifying Evans and Moore. Instead, they only mentioned "two individuals" in the alleyway, even though the BWC footage shows at least four men standing by the alleyway at the time Sgt. Sejdic approached. BWC (0:36).

This absence of specificity distinguishes these facts from seizures approved by the Fourth Circuit Court of Appeals based on tipster information. *See United States v. Christmas*, 222 F.3d 141, 143-144 (4th Cir. 2000) (holding that an in-person tip from an unnamed, intoxicated woman that a neighbor two houses down had drugs and guns was sufficiently reliable due to the close proximity of her person and her home to the activities); *United States v. Griffin*, 589 F.3d 148, 150 (4th Cir. 2009) (holding an unnamed informant's tip supported probable cause when the officer spoke to an occupant of a motel room from which the 911 call originated who identified a man driving past the motel in a white Cadillac as the subject of the 911 call); *United States v. Perkins*, 363 F.3d 317, 319-320 (4th Cir. 2004) (finding an unidentified tipster sufficiently reliable when the woman reported two white men, in a red car with a white stripe, pointing and displaying rifles in various directions in a high crime residential area.); *Mitchell*, 963 F.3d at 395 (the informant was a bystander on the scene who had the opportunity to have observed the events and to have seen the defendant, who (somehow) made it known he had a gun. The bystander's specific description of the Defendant as "a black man with a gun wearing red pants and a black shirt walking eastbound on Fourth Avenue away from Rehab was consistent with, but provided greater detail than, the initial report…").

9

Case 3:23-cr-00085-KDB-DCK   Document 29   Filed 03/06/24   Page 9 of 15

Similarly, in cases involving phone tips, which are inherently less reliable, some degree of specificity is required. *See United States v. Foster*, 824 F.3d 84, 94-95 (4th Cir. 2016) (Court found reasonable suspicion where the officers were investigating a reported gun shot, in a high crime area (at night), and the eventual defendant was the only person in the area where the gunshot was reported); *United States v. Reaves*, 512 F.3d 123, 125-28 (4th Cir. 2008) (Court held that a 911 caller's tip was not reliable despite the fact she stayed on the line with 911 as she followed the defendant's vehicle, relaying their location, before leaving her pursuit to go to the market.); *United States v. Brown*, 401 F.3d 588, 596 (4th Cir. 2005) (Court held that an anonymous caller's tip was insufficient to establish reasonable suspicion where the tip provided "nothing more than a brief, general description of Brown, his whereabouts, and an allegation that he was carrying a firearm.").

Sgt. Sejdic took no action to corroborate the tipsters' reports.[5] The BWC footage reveals that Sgt. Sejdic slowly drove 13 seconds across a parking lot. Judging from the angle of the video and where Evans was standing when Sgt. Sejdic stepped out of his vehicle, Evans would have been in Sgt. Sejdic's line of sight well before he drove over. BWC (0:17-0:35). And yet, Sgt. Sejdic did not suggest that he saw any activity consistent with the tipsters' information and "did not mention ever having seen [Evans] selling drugs." *United States v. Peters*, 60 F.4th 855, 867 (4th Cir. 2023). Sgt. Sejdic's BWC footage also shows another pair of individuals were standing by the alley as he approached. BWC (0:36). Merely standing in a high crime area does not make individuals walking around at 7:00 pm in the evening "less worthy of Fourth Amendment protection by making them more susceptible to search and seizure by virtue of where they [are]." *Peters*, 60 F.4th at 869; (*see*

---

[5] Presumably, Sgt. Sejdic intended to attempt to corroborate the tipsters' information during his non-custodial interaction with the "two individuals."

Tr. 5, 17-18). Moreover, other individuals walked through the alleyway during the course of the encounter. BWC (3:51).

And, although Sgt. Sejdic's subjective beliefs regarding reasonable suspicion are not controlling, as discussed above, he (correctly) did not believe he had reasonable suspicion to seize Evans based only on the tipsters' information. When asked whether he intended to pat down Evans when he exited his patrol car, Sgt. Sejdic responded: "At this initial encounter right now, no, sir. My initial plan was just to get out and speak to them to see what's going on." (Tr. 25).

Thus, "tak[ing] into account all the facts surrounding a tip in assessing the totality of the circumstances supporting a stop," *Peters*, 60 F.4th at 866 (quoting *United States v. Drakeford*, 992 F.3d 255, 264 (4th Cir. 2021)), the unnamed tipsters "could not have significantly elevated the police officers' suspicion" and their information lacked the specificity needed to establish indicia of reliability. *Id*. To be sure, Sgt. Sejdic was justified in approaching Evans and Moore based upon the tipsters' information. But additional indicia of criminal conduct was required to initiate a *Terry* stop.

### 2. Evans' Criminal Record

Second, Evans' criminal history "is not, standing alone, sufficient to create reasonable suspicion." *Foster*, 634 F.3d at 247 (quoting *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997)). Sgt. Sejdic testified that he was familiar with Evans' criminal record because he had "personally arrested [Evans] for domestic violence cases, drug-related offenses, and weapon[s] law violations." (Tr. 7-8).

The Court finds this history is insufficient to support reasonable suspicion for two reasons. First, Evans' prior offenses were unrelated to the tipsters' accusations of drug dealing. Evans' prior drug-related offenses (simple possession of marijuana and possession of drug paraphernalia)

11

involved possession, not dealing, and ultimately were dismissed. *See* Doc. No. 10 at 4-6; *see also Peters*, 60 F.4th at 865 ("As we have clarified in the past, holding [that past arrests, convictions, and knowledge that a suspect is under investigation are sufficient] would allow 'any person with any sort of criminal record—or even worse, a person with arrests but no convictions—[to] be subjected to an investigative stop … at any time without the need for any other justification at all." (quoting *United States v. Powell*, 666 F.3d 180, 188 (4th Cir. 2011) (alteration in original)). Evans, in the body camera footage, later stated that the civil domestic violence charge, also unrelated to the drug dealing accusations, had been dropped. BWC (3:00-3:01).

Second, his prior arrest for a weapons-related offense had occurred 8 years earlier, when Evans was 16 years old. *See* Doc. 10 at 4. Several-year-old offenses do not necessarily "heighten any suspicion that [Evans] was engaged in crime." *Peters*, 60 F.4th at 865 (noting that eight-year old police alerts marking the defendant as a gang member could not support reasonable suspicion without more information). Moreover, the old weapons charge is irrelevant to the accusations of drug dealing. Permitting a largely irrelevant criminal record to substantiate reasonable suspicion that Evans was dealing drugs would allow officers to "disturb a free person's liberty solely because of a criminal record. Under the Fourth Amendment[,] our society does not allow police officers to 'round up the usual suspects.'" *Powell*, 666 F.3d at 188 (quoting *United States v. Laughrin*, 438 F.3 1245, 1247 (10th Cir. 2006)).

### 3. <u>Moore's Flight</u>

Sgt. Sejdic also testified that his "senses of Kaiterrance Moore running away" informed his decision to conduct a *Terry* stop (and frisk) on Evans. (Tr. 29) "[U]nprovoked flight upon noticing the police" in a high crime area can be a "pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975)).

However, "reasonable suspicion as to [one person] does not amount to, and is not particularized as to [the other], and [the court] refuse[s] to find reasonable suspicion merely by association." *Black*, 707 F.3d at 540. Moreover, one suspect's "prior arrest history cannot be a logical basis for a reasonable, particularized suspicion as to" the other. *Id.*

And yet, Sgt. Sejdic, in a line of questioning regarding whether this was a casual encounter or something more, testified that as "[s]oon as Kaiterrance started running away from me, that's when everything switched for me, sir." (Tr. 44). Sgt. Sejdic opined that Moore "was involved in a lot of shootings in that area" and that "Moore might be armed with a firearm or he might have a warrant; that's why he was running away from me." *Id.* at 7. And so, it appears that Sgt. Sejdic's opinion of Moore, based on Moore's flight and criminal record (which did not involve drug dealing), was a significant contributor to Sgt. Sejdic's decision to detain Evans. This comports with the BWC footage, in which Sgt. Sejdic asked Evans about Moore's decision to flee three times in quick succession in the seconds before Evans was seized. BWC (0:42-0:53).

Further, because Moore fled after Sgt. Sejdic received information from the unknown tipsters, his testimony that Moore's flight changed his views suggests that Sgt. Sejdic placed impermissible weight on Moore's flight into his decision to conduct a *Terry* stop of Evans. Thus, it appears the "seizure has no connection with the individual seized, the activity they were involved in, their mannerisms, or their suspiciousness; rather, the seizure is a mere happenstance of geography." *Black*, 707 F.3d at 541.

### 4. "Blading"

"Blading," as demonstrated by Sgt. Sejdic during his testimony, involves turning one's body away from the officer to conceal something. (Tr. 46). In response to a question about whether he noticed anything on Evans' body as he approached, Sgt. Sejdic testified that "the only feature I

13

noticed about [Evans]" was his blading, which had Sgt. Sejdic "already thinking [Evans] may be in possession of a firearm." *Id.* at 9. However, the only portion of the BWC footage shown to Sgt. Sejdic by either party in which he described Evans as "blading" occurred long after Evans was seized. (Tr. 38-40). Although Sgt. Sejdic testified that he believed Evans was "blading" prior to being seized, the BWC does not support his testimony. *Id*. at 8.

In those few seconds between Sgt. Sejdic exiting his patrol car and the seizure of Evans, Sgt. Sejdic was engaged in a "casual encounter" with Evans. Thus, until Evans was seized by Sgt. Sejdic when told to "hang on a second" for the second time, Evans had the "right to ignore his interrogator and walk away." *Burton*, 228 F.3d at 527 (4th Cir. 2000) (quoting *Terry*, 392 U.S. at 33 (Harlan, J., concurring)). Because Evans "may refuse to cooperate and go on his way" until he is seized, the Court will not consider his decision to turn away, yet stay in the immediate area (especially when compared to Moore's flight), as furtive behavior that supports reasonable suspicion. *Terry*, 392 U.S. at 24 (White, J., concurring). Accordingly, the Court finds that Sgt. Sejdic's "blading" allegations do not support a finding of reasonable suspicion.[6]

Ultimately, the Court concludes that the above factors, either individually or in combination, fail to establish reasonable suspicion. Therefore, the Court finds that the *Terry* stop

---

[6] After describing the factors that he believed justified a *Terry* frisk of Evans, Sgt. Sejdic later testified that he also noticed a bulge at "the beginning" of the encounter. (Tr. 11). However, upon review of the body camera footage and the hearing transcript, the Court finds that evidence of a visible bulge in Evans' jacket is not present until well after his seizure. Sgt. Sejdic's hand blocks the camera from 0:44-0:51, and during the few seconds Evans can be seen before he is seized there is no evidence of blading, and no bulge can be seen in his jacket. During this time, Evans was largely turned away from Sgt. Sejdic, making a bulge difficult to see. It was evident during the hearing that Sgt. Sejdic had not reviewed the BWC to refresh his recollection prior to testifying. His testimony accurately described events that occurred, but not necessarily when in the timeline they occurred.

14

was unsupported by reasonable suspicion and the Court will grant Defendant's Motion to Suppress.

This a close question. Reasonable suspicion to seize and search Evans clearly arose during Sgt. Sejdic's encounter with Evans, but it arose after Evans' seizure. The Court is cognizant of the challenges of modern-day policing and appreciates the difficulties for police officers making split second decisions with constitutional ramifications. Sgt. Sejdic was proven correct in his subjective suspicion that Evans was engaged in criminal conduct. But the Fourth Amendment protects the guilty as well as the innocent as the price our society pays for ordered liberty.

### IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendant's Motion to Suppress (Doc. No. 19) is **GRANTED**; and
2. Evidence derived from the unlawful seizure and search of Evans will be excluded.

**SO ORDERED.**

Signed: March 6, 2024

Kenneth D. Bell
United States District Judge